This is a capital murder case. A detailed statement of the facts is contained in the opinion of the Court of Criminal Appeals, Godbolt v. State, 546 So.2d 982 (Ala.Cr.App. 1986).
Jerry Steven Godbolt, the defendant, was indicted by a Jefferson County Grand Jury for murdering Myra Faye Tucker and her husband, Terry Wayne Tucker, while robbing them. The defendant was first tried for the capital murder of Mrs. Tucker. The jury found him guilty and recommended the death sentence. The trial court sentenced him to life imprisonment without parole. That conviction and the sentence were later affirmed on appeal. Godbolt v. State, 429 So.2d 1131
(Ala.Cr.App. 1982). (The defendant's trial for the murder of Mrs. Tucker will sometimes be referred to in this opinion as his "first trial.")
The defendant was later tried for the capital murder of Mr. Tucker; the jury found him guilty and recommended the death sentence. Pursuant to that recommendation, the trial court sentenced the defendant to death in accordance with § 13A-5-31(a)(2), Code 1975 (repealed 1981).[1] The Court of Criminal Appeals affirmed that conviction and sentence and later overruled the defendant's application for rehearing. He then filed this petition for a writ of certiorari seeking review of *Page 993 
his conviction and sentence for the capital murder of Mr. Tucker. We granted the writ pursuant to Rule 39(c), Ala.R.App.P.
Applying the principles of collateral estoppel and double jeopardy, the defendant contends that because his first trial resulted in a sentence of life imprisonment without parole, the state was precluded from seeking the death sentence in this case. We disagree.
The defendant primarily relies on Bullington v. Missouri,451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), and Ashe v.Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).
In Poland v. Arizona, 476 U.S. 147, 106 S.Ct. 1749,90 L.Ed.2d 123 (1986), we find the following synopsis ofBullington:
 "In Bullington v. Missouri, supra, this Court held that a defendant sentenced to life imprisonment by a capital sentencing jury is protected by the Double Jeopardy Clause against imposition of the death penalty in the event that he obtains reversal of his conviction and is retried and reconvicted. The Court recognized the usual rule to be that when a defendant obtains reversal of his conviction on appeal,
 'the original conviction has been nullified and "the slate wiped clean." Therefore, if the defendant is convicted again, he constitutionally may be subjected to whatever punishment is lawful, subject only to the limitation that he receive credit for time served.' Id., 451 U.S., at 442, 101 S.Ct., at 1860 (quoting North Carolina v. Pearce, 395 U.S. 711, 721, 89 S.Ct. 2072, 2078, 23 L.Ed.2d 656
(1969)).
 However, the Court found that its prior decisions had created an exception to this rule: '[T]he "clean slate" rationale . . . is inapplicable whenever a jury agrees or an appellate court decides that the prosecution has not proved its case.' Bullington, supra, 451 U.S. at 443, 101 S.Ct., at 1860. Although it is usually 'impossible to conclude that a sentence less than the statutory maximum "constitute[s] a decision to the effect that the government has failed to prove its case," ' ibid. (quoting Burks v. United States, 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978)), the Court found that Missouri, by 'enacting a capital sentencing procedure that resembles a trial on the issue of guilt or innocence, . . . explicitly requires the jury to determine whether the prosecution has "proved its case," ' id., at 444, 101 S.Ct., at 1861 (emphasis in original).*
Accordingly, the Court held that the jury's decision to sentence Bullington to life imprisonment after his first conviction should be treated as an 'acquittal' of the death penalty under the Double Jeopardy Clause."
476 U.S. at 151-152, 106 S.Ct. at 1753-54.
In Ashe, three or four armed, masked men robbed six men playing poker in the home of one of the victims. The defendant was charged in separate counts with the robbery of each of the six players. He was tried on one count and acquitted because there was insufficient evidence to convince the jury that he was present when the victims were robbed. The Supreme Court held that the principle of collateral estoppel is embodied within the prohibition against double jeopardy contained in the Fifth Amendment to the United States Constitution and, because it had been previously determined by a jury that the defendant was not present when the victims were robbed, the state was precluded on double jeopardy grounds from thereafter prosecuting him for the robbery of a different player. The Court noted:
 " 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated *Page 994 
between the same parties in any future lawsuit. Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in United States v. Oppenheimer, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 [1916]. . . ."
The defendant's argument, as we understand it, is that the life sentence imposed by the trial court at his first trial was, under Bullington and Ashe, conclusive on the trial court in this case. He reasons that because the deaths of the Tuckers were the result of one continuous transaction consisting of several inextricably intertwined acts, the aggravating and mitigating circumstances would necessarily be the same in both cases; therefore, he argues that when the trial court at his first trial sentenced him to life imprisonment without parole for the murder of Mrs. Tucker (pursuant to its consideration of the aggravating and mitigating circumstances which it found to exist) the issue of whether the death sentence was appropriate for the murder of Mr. Tucker was also determined in his favor (i.e., that he was acquitted of the death sentence for both offenses under Bullington). Thus, the defendant seeks to foreclose a "reconsideration" of the death sentence in this case under the rationale of Ashe.
At this point we should note that although one continuous transaction led to the deaths of the Tuckers, the record in this case, as well as the record from the first trial, clearly shows that separate, distinct offenses were committed against each victim. A plea of double jeopardy is unavailing unless the offense presently charged is the same in law and fact as the former one relied on under the plea. Therefore, the defendant was subject to prosecution for each of these killings. SeeClift v. State, 352 So.2d 838 (Ala. 1977); Colston v. State,350 So.2d 337 (Ala. 1977); Racine v. State, 291 Ala. 684,286 So.2d 896 (1973).
When Bullington is considered in conjunction with Alabama's capital sentencing proceeding (in which the trial court, not the jury, is the ultimate sentencing authority)[2] it stands for the proposition that a defendant sentenced to life imprisonment without parole by the trial court is protected against the later imposition of the death sentence in the event that he obtains a reversal of the conviction and is retried andreconvicted for the same offense. As previously stated, the defendant was first convicted and sentenced to life imprisonment without parole for the capital murder of Mrs. Tucker. Under Bullington, the defendant was acquitted of the death sentence for that offense. However, he was then convicted and sentenced to death for the capital murder of Mr. Tucker in this case. As we understand Bullington, it does not apply where a defendant is tried for and convicted of one capital murder and sentenced to life in the penitentiary without parole and then later tried and convicted of a completely separate capital murder and sentenced to death. Accord, Wheat v. State,420 So.2d 229 (Miss. 1982), cert. denied, 460 U.S. 1056,103 S.Ct. 1507, 75 L.Ed.2d 936 (1983).
However, the defendant insists that it was determined at his first trial that he should not receive the death sentence in this case. This conclusion is based upon the defendant's assertion that the aggravating and mitigating circumstances were the same in both cases. Thus, the defendant's position is that Bullington applies because, he says, he has been "tried" and "convicted" twice on the issue of the propriety of the death sentence in his case.
At the risk of belaboring the point, we must state again that the defendant was indicted, convicted, and sentenced at this first trial for the capital murder of Mrs. Tucker, not Mr. Tucker. A sentence in a capital murder case, be it life imprisonment without parole or death, is imposed by the trial court only after careful consideration of the aggravating and mitigating circumstances *Page 995 
which it finds to exist in the particular case. No specific findings with regard to those circumstances were made by the trial court at the defendant's first trial. The trial court stated only that "The court having considered the aggravating and mitigating factors and all the evidence in the case, the court does now commute the sentence to life imprisonment without parole. . . ." We note that the trial court instructed the jury on the aggravating circumstances set out in § 13A-5-35(4), Code 1975, and the mitigating circumstances set out in § 13A-5-36(1), (4), (5), (6), and (7), Code 1975. The court also instructed the jury to consider "any aspect of the defendant's character and life and any of the circumstances of the capital offense which tend to indicate that the defendant should not be sentenced to death."
In fixing the defendant's sentence at death in this case, the trial court specifically found three aggravating circumstances:
(1) Mr. Tucker was robbed and then intentionally killed by the defendant. See § 13A-5-35(4), supra;
(2) The defendant had been previously convicted of another capital murder (i.e., the murder of Mrs. Tucker). See § 13A-5-35(2), Code 1975; and,
(3) The capital murder of Mr. Tucker was especially heinous, atrocious, or cruel. See § 13A-5-35(8), Code 1975.
The trial court in this case also specifically found two mitigating circumstances:
(1) The defendant had no significant history of prior criminal activity. See § 13A-5-36(1), supra; and,
(2) The defendant was 21 years of age at the time he committed the offense. See § 13A-5-36(7), supra.
Clearly, the trial court's imposition of the death sentence in this case was based upon its consideration of the aggravating and mitigating circumstances which it found to exist in connection with the murder of Mr. Tucker. Contrary to the defendant's contention, the aggravating circumstances considered by the trial court at the defendant's first trial (presumably those contained in § 13A-5-35(4), supra) could not have been the same as those found by the trial court in this case because at the first trial the issue centered on the defendant's actions toward Mrs. Tucker. The first and third aggravating circumstances found to exist in this case related solely to the defendant's actions toward Mr. Tucker. The second one obviously could not have been considered at the first trial. Furthermore, because the trial court at the first trial made no specific findings with regard to the mitigating circumstances which it considered, we simply have no way of knowing what "mitigating factors" it found to exist.
Based upon our review of the record from the first trial, we are simply unable to find any evidence to support the defendant's contention that the trial court did anything at that time which would have precluded the trial court in this case from imposing the death sentence as it did.Bullington and Ashe do not control this case.
For the foregoing reasons we agree with the Court of Criminal Appeals that the state was not precluded from seeking the death sentence in this case.
The defendant next contends that the trial court erred in this case by admitting evidence which showed how Mrs. Tucker was mistreated and then killed. He argues that this evidence was irrelevant because he was on trial for the murder of Mr. Tucker and that its admission only served to inflame and prejudice the jury. As the Court of Criminal Appeals correctly held, the evidence showing how Mrs. Tucker was mistreated and then killed was within the res gestae of the offense against Mr. Tucker and served to shed light on the acts, motive, and intent of the defendant. The admission of this evidence was not error. Higginbotham v. State, 262 Ala. 236, 78 So.2d 637
(1955).
The defendant also contends that the trial court erred in admitting his testimony from the first trial. He argues that because he elected not to testify in this case, the admission of his testimony from the first trial was in contravention of his right against self-incrimination and also constituted *Page 996 
an improper comment on his failure to testify.
Both the Fifth Amendment to the United States Constitution and Article I, § 6, of the Constitution of Alabama 1901 prohibit a defendant from being compelled to be a witness against himself. Section 12-21-220, Code 1975, reads as follows:
 "On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment."
The record from the first trial clearly shows that the defendant intelligently waived his constitutional right to remain silent. The defendant voluntarily took the stand and testified under the guidance and supervision of his counsel and in the presence of and under the protection of the trial court. Therefore, the admission in this case of his testimony from the first trial was not in contravention of his right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 478,86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today"). See also Annot., 5 A.L.R.2d 1404 (1949).
It is well established that a defendant's election to remain silent at trial cannot be commented upon by the district attorney, either directly or indirectly. Beecher v. State,294 Ala. 674, 320 So.2d 727 (1975); Diamond v. State, 49 Ala. App. 68, 268 So.2d 850 (1972); Thompson v. State, 41 Ala. App. 353,132 So.2d 386 (1961). However, we are not prepared to say that the defendant's testimony from the first trial was inadmissible as a comment on his failure to testify in this case. Neither the organic nor the statutory law was intended to operate in such a manner as to relieve the defendant of the incriminating effect of the voluntary testimony which he gave at the first trial. See Bess v. Commonwealth, 118 Ky. 858, 82 S.W. 576
(1904); Miller v. People, 216 Ill. 309, 74 N.E. 743 (1905).
The defendant next contends that his conviction must be reversed because the court reporter did not record the closing argument of the district attorney. The Court of Criminal Appeals disagreed, relying on § 12-17-275, Code 1975, which, in pertinent part reads: "The official court reporter . . . shall take full stenographic notes of the oral testimony and proceedings, except argument of counsel. . . ." (Emphasis added.) The court reporter is not required under this section to record closing arguments except when there is an objection. See Ervin v. State, 399 So.2d 894 (Ala.Cr.App.), cert. denied,399 So.2d 899 (Ala. 1981). There was no objection to the district attorney's closing argument in this case. In fact, one of the defendant's attorneys conceded during oral argument before this Court that he could not specify any statement made by the district attorney during the closing argument that would necessitate a reversal. However, it is argued that because we cannot scrutinize the district attorney's closing statements in light of our "plain error" rule, see Rule 39(k), Ala.R.App.P., and Ex parte Bush, 431 So.2d 563 (Ala. 1983), we should presume that reversible error occurred. We disagree.
The defendant relies on several federal cases: United Statesv. Taylor, 607 F.2d 153 (5th Cir. 1979), United States v.Brumley, 560 F.2d 1268 (5th Cir. 1977), and United States v.Upshaw, 448 F.2d 1218 (5th Cir. 1971), cert. den.,405 U.S. 934, 92 S.Ct. 970, 30 L.Ed.2d 810 (1971). The Fifth Circuit Court of Appeals recognized in these cases that there are times when reversible error should be presumed when a court reporter fails to comply with the Court Reporter Act,28 U.S.C.A. § 753(b), by omitting some portion of the trial proceedings. However, that court has not chosen to *Page 997 
adopt a per se rule requiring reversal for any and all omissions. Error is presumed only if the defendant is represented on appeal by counsel other than the attorney at trial. The Fifth Circuit rule is well expressed in UnitedStates v. Selva, 559 F.2d 1303 (5th Cir. 1977):
 "While both the [Court Reporter Act] and [Hardy v. United States, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964)] insure to a defendant the right to a complete record on appeal, there has been considerable litigation in this court over the effect of a failure to comply with the Act. Two rules have evolved. The first holds that failure to comply with the Act is not error per se and will not work a reversal absent a specific showing of prejudice — i.e., appellant must show that failure to record and preserve the specific portion of the trial proceedings visits a hardship upon him and prejudices his appeal. United States v. Alfonso, 552 F.2d 605 (5th Cir. 1977); United States v. Long, 419 F.2d 91 (5th Cir. 1969); Addison v. United States, 317 F.2d 808 (5th Cir. 1963); Strauss v. United States, 311 F.2d 926 (5th Cir. 1963).* The government urges upon us this body of law as controlling our decision here. We disagree. An examination of the second body of case law reveals that a different rule obtains in cases involving new counsel on appeal. When, as here, a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to mandate reversal. See United States v. Gregory, 472 F.2d 484 (5th Cir. 1973) (dicta); United States v. Garcia-Bonifascio, 443 F.2d 914 (5th Cir. 1971); United States v. Rosa, 434 F.2d 964 (5th Cir. 1970); United States v. Atilus, 425 F.2d 816 (5th Cir. 1970); Stephens v. United States, 289 F.2d 308
(5th Cir. 1961). The wisdom of this rule is apparent. When a defendant is represented on appeal by the same attorney who defended him at trial, the court may properly require counsel to articulate the prejudice that may have resulted from the failure to record a portion of the proceedings. Indeed, counsel's obligation to the court alone would seem to compel him to initiate such disclosure. The attorney, having been present at trial, should be expected to be aware of any errors or improprieties which may have occurred during the portion of the proceedings not recorded. But when a defendant is represented on appeal by counsel not involved at trial, counsel cannot reasonably be expected to show specific prejudice. To be sure, there may be some instances where it can readily be determined from the balance of the record whether an error has been made during the untranscribed portion of the proceedings. Often, however, even the most careful consideration of the available transcript will not permit us to discern whether reversible error occurred while the proceedings were not being recorded. In such a case, to require new counsel to establish the irregularities that may have taken place would render illusory an appellant's right to notice plain errors or defects, Hardy, 375 U.S. at 280, 84 S.Ct. 424, and render merely technical his right to appeal.
 "We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to conclude affirmatively that no substantial rights of the appellant have been adversely affected by the omissions from the transcript. When, as here, a substantial and significant portion of the record is missing, and the appellant is represented on appeal by counsel not involved at trial, such a conclusion is foreclosed. . . . *Page 998 
559 F.2d at 1305-06.
In our view, the approach taken by the Fifth Circuit is a sound one and the rule applied in that court should be applied in this case. Here, the defendant is represented on appeal by one of the same attorneys who represented him at trial. As previously noted, there was no objection made at trial to any of the statements made by the district attorney during the closing argument. This indicates to us that the district attorney's closing statements did not exceed the bounds of the law. Furthermore, no specific error has been alleged on appeal. The inability of the defendant's attorney who was present at trial to recall any statements on the part of the district attorney that would rise to the level of reversible error further indicates to us that none was made. Moreover, no effort has been made to reconstruct the substance of the closing argument for submission as a supplement to the record. See Rule 10(d), Ala.R.App.P., and Strauss v. United States, 311 F.2d 926
(5th Cir. 1963), cert. den., 373 U.S. 910, 83 S.Ct. 1299,10 L.Ed.2d 412 (1963). Even though the Court of Criminal Appeals and this Court are required to search the record for plain error in every case in which the death sentence has been imposed and to take the appropriate action when such error is found, neither the Court of Criminal Appeals nor this Court will presume that reversible error occurred at trial when there is nothing in the record to so indicate, unless the defendant is not represented on appeal by the same attorney who represented him at trial.
Finally, the defendant contends that under the Supreme Court's recent decision in Wainwright v. Witt, 469 U.S. 412,105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the trial court erroneously excluded prospective jurors because of their views against capital punishment. He argues that the trial court applied the guidelines set out in Witherspoon v. Illinois,391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and that, in doing so, it "tipp[ed] the scales in favor of the prosecution and further prevented [him] from receiving a fair and impartial trial from a jury of his peers." We have carefully reviewed the record in this regard and it clearly shows that the trial court did not run afoul of Wainwright, supra, when it excluded the prospective jurors in this case.
Pursuant to Rule 39(k), supra, we have searched the record for plain error in the trial below and have found none except that now to be discussed.
Although the matter was not called to our attention by counsel, our search of the record has revealed that the following occurred subsequent to the selection of the jury:
 "THE COURT: All right. The defendant wishes to make a motion.
 [Defense Counsel]: Your Honor, at this time we would make a motion to quash the jury that's been selected in this case because of the systematic exclusion of blacks from the panel that will be sitting in this case. And, Judge, rather than go by name I'll go by number that we used yesterday. The State struck in this order No. 148, black female: No. 65, black female; No. 26, black male; No. 147, a black male; No. 167, a black male; No. 202, a black male; No. 152, a black female. Then at that point in time they struck No. 170, which was the white female that goes to church with my co-counsel. . . . And this was done immediately after [my co-counsel's] wife came in last night. The next strike was No. 199, a black male. The next strike was No. 81, a black male; No. 162, black male; No. 195, black female; No. 169, black male. And the last strike, No. 146, the *Page 999 
retired physician who went to school with [my co-counsel].
 "And we say that this was done strictly for the purpose of excluding blacks from this jury and ask His Honor to quash the entire jury because of this systematic exclusion of blacks from this jury.
"[District Attorney]: Judge, may we be heard?
"THE COURT: You may be heard.
 "[District Attorney]: I think your Honor is well aware of the case called — I believe it's James Allen, III, I'm not sure about that — where the Court of Criminal Appeals has written a decision saying that peremptory challenges can be used in whatever manner that the lawyers see fit. And it wasn't a systematic exclusion of blacks if the district attorney did in fact strike all blacks.
 "THE COURT: I believe that was the case that recently came out, didn't it?
"[District Attorney]: Sir?
 "THE COURT: That's a very recent case, too, isn't it?
 "[District Attorney]: No. sir. It's about a year old. I think the author of that case was Judge DeCarlo. . . .
 "THE COURT: I believe there's been another recent case that's more recent even than that that came out. And I never do remember cases.
 "[Defense Counsel]: We would respond in this fashion, sir. Out of the facts the law arises and there has never been a stable period of history — a stable period in the history of the legal profession in the judiciary system in this country. And the theorem of ruling case law is that the judicial decisions are dynamic. And we don't know what the Court of Criminal Appeals or the other appellate courts will decide in this particular instance, even though the Honorable [Judge] DeCarlo has ruled otherwise.
 "[District Attorney]: May it please the Court, I respect [defense counsel's] saying, but nevertheless I think you'll find that case went to the Supreme Court of Alabama and as of this date that is the law in Alabama. It may change.
 "THE COURT: That is the law as I understand it to be. So I will deny the motion to quash, as I understand peremptory [challenges] can be made for any cause which the person so exercising feels to be necessary for the trial of the case. So I will deny your motion and give an exception thereto."
Since the district attorney in this case was never required to give explanations for his striking of the blacks from the venire, we remand this case to the Court of Criminal Appeals for it to order further proceedings. If the trial court determines that the facts establish a prima facie case of purposeful discrimination and the district attorney does not come forward with race-neutral explanations for its strikes, then the defendant is entitled to a new trial. Griffith v.Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). See also Ex parte Jackson, 516 So.2d 768 (Ala. 1986).
REMANDED WITH INSTRUCTIONS.
TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, BEATTY and STEAGALL, JJ., concur.
ADAMS, J., not sitting.
[1] The 1975 capital punishment statute, as contained in §§ 13-11-1 through 13-11-9, was carried over intact to the new criminal code as §§ 13A-5-30 through 13A-5-38. These sections of the new criminal code were repealed, effective July 1, 1981, by the 1981 capital offense statute, but only as to conduct occurring on or after July 1, 1981. Therefore, conduct occurring before July 1, 1981, as in the present case, is governed by the preexisting law, i.e., § 13A-5-30 through 13A-5-38. See Spears v. State, 428 So.2d 174 (Ala.Cr.App. 1982).
* "The 'case' to which the Court referred in Bullington was the prosecution's case that the defendant deserved the death penalty. The analogy drawn was between a death sentence and a verdict of guilty, a life sentence and a verdict of innocent. The Court emphasized that the sentencer was required to make a choice between 'two alternative verdicts,' 451 U.S., at 438,101 S.Ct., at 1858. . . ." (Footnote in original.)
[2] Alabama's capital sentencing proceeding is indistinguishable for double jeopardy purposes from the capital sentencing proceeding discussed in Bullington. See 476 U.S. at 152,106 S.Ct. at 1754, n. 4.
* The rule established by this line of cases is well expressed in the following portion of the opinion in Addison,317 F.2d 808 (5th Cir. 1963), in which appellants claimed that the failure of the court reporter to record the arguments of counsel was reversible error:
" 'In their appeal in this case, although appellants were represented in the trial by six lawyers, one of whom is still representing one of the appellants in this court, the record is silent as to any objection made or any motion of any kind filed with respect to any alleged impropriety during the course of the final arguments of counsel. Nor have the appellants in their original brief filed in this case attempted to state that any inflammatory or other improper comments were made by counsel during their summations. Obviously, even though a failure of the court reporter to report the arguments of counsel [was] an error per se, such error would not be available to appellants to work a reversal without a showing that it was prejudicial error . . . Without even the contention being made as to language used or other conduct of counsel that goes beyond the permitted range of oral argument, no effort is made to show that such failure prejudiced appellants.Id. at 811.' " (Footnote in original.)
 ON APPLICATION FOR REHEARING